**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **IN RE:**<br><br>**CAASTLE, INC.,**<br><br>　　　**Debtor.** | **CHAPTER 7**<br><br>**CASE NO. 25-11187-BLS** |
| **GEORGE L. MILLER,** solely in his capacity as chapter 7 trustee for the bankruptcy estate of CaaStle, Inc.,<br><br>　　　**Plaintiff,**<br><br>**v.**<br><br>**CHRISTINE HUNSICKER, JASWINDER PAL SINGH, SCOTT CALLON, GEORGIY GOLDENBERG a/k/a GEORGE GOLDENBERG, JOHN HENNESSY, CHIRAG JAIN, DAYNA CORLITO, LORI HOBERMAN, HOBERMAN LAW GROUP PLLC**<br><br>　　　**Defendants.** | **ADV. CASE NO.** _____ |

## <u>CHAPTER 7 TRUSTEE'S COMPLAINT</u>

Plaintiff George L. Miller (the "Plaintiff" or the "Trustee"), solely in his capacity as the Chapter 7 Trustee of the bankruptcy estate of CaaStle Inc. ("CaaStle" or the "Company"), by and through his undersigned counsel, hereby brings this Complaint against Defendants Christine Hunsicker ("Hunsicker"), Jaswinder Pal Singh ("Singh"), Scott Callon ("Callon"), Georgiy Goldenberg a/k/a George Goldenberg ("Goldenberg"), John Hennessy ("Hennessy"), Chirag Jain ("Jain"), Dayna Corlito ("Corlito"), Lori Hoberman ("Hoberman"), and Hoberman Law Group PLLC (collectively, "Defendants") and avers as follows. Plaintiff's allegations are based on personal knowledge as to his own acts and information and belief as to the actions of others.

#125534859v1

Plaintiff's information and belief allegations are based on information available to him and his counsel as more fully set out in this Complaint. Plaintiff's information and belief allegations will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

## INTRODUCTION

1. When a company appoints world-famous business leaders and self-styled corporate governance experts to its Board of Directors, such as Defendants John Hennessy and Scott Callon, one would expect them to bring their knowledge, experience, and business acumen to the table. This case unfortunately instructs that even the most highly touted individuals, through complacency and willful blindness, can enable a five-year pattern of misconduct causing $300 million in damages and the bankruptcy of a once-promising company.

2. By now, the brazen fraud committed by Christine Hunsicker, the former CEO of CaaStle, Inc., and enabled by the Defendants, has been widely publicized. According to a press release by the U.S. Attorney's Office for the Southern District of New York concerning Hunsicker's guilty plea, between 2019 and 2025, Hunsicker repeatedly sent fabricated audited financial statements and other financial information to investors to obtain investments under false pretenses.[1]

3. What has been less reported, however, is that neither the Board of Directors—nor many of the company's officers—ever stepped in to deter the CEO's blatant misconduct. In fact, as alleged more fully below, the directors and officers were content to allow Hunsicker to act without any guardrails in place, as they ignored even the most fundamental aspects of corporate governance.

---

[1] https://www.justice.gov/usao-sdny/pr/caastle-founder-pleads-guilty-300-million-fraud-scheme

4.      Even less discussed is who comprised CaaStle's Board throughout the time Hunsicker was defrauding investors.

5.      Defendant John Hennessy sat on the CaaStle Board of Directors from April 2017 to December 2024. Hennessy currently serves as the Chairman of Alphabet, Inc. (formerly known as Google), and from 2000 to 2016 was the President of Stanford University. Prominent venture capitalist Marc Andreessen dubbed Hennessy the "godfather of Silicon Valley."

6.      Defendant Scott Callon served as a CaaStle Board member from May 2014 to April 2025. Callon's knowledge and experience with intricate corporate governance issues is so extensive that he was hand-picked by the Japanese government to serve on a committee charged with drafting the country's "Corporate Governance Code." In 2018, before Hunsicker began her fraudulent conduct, Callon sat for an interview with Forbes titled, *Scott Callon: How an American Corporate Governance Specialist Takes a Zen Approach to Investing in Japan*.

7.      The third CaaStle director during Hennessy's and Callon's tenure was CaaStle CEO Christine Hunsicker.

8.      Despite combining for over half a century of experience in business and corporate governance and despite their duties as Board members, Hennessy and Callon were so willfully oblivious that they only learned of Hunsicker's widespread fraud after others outside the Company started to notice discrepancies in the financial information provided. The Board's lack of oversight and failure to review Company financial information constitutes wrongful conduct, and the Board members should have noticed those discrepancies at least a year earlier.

9.      Shockingly, when Hennessy learned of Hunsicker's fraud in 2024, he attempted to distance himself and resign from the Board, retroactive to 2021. He did so despite openly

3

participating in Board activities through 2024, during which time he attended Board meetings and held himself out to outsiders as a director of CaaStle.

10.    Callon's response to learning about the fraud was equally stunning. Indeed, Callon allowed Hunsicker to dictate the terms of her resignation from the Board and the composition of the Board, and permitted her to remain CEO of CaaStle for another three months. According to the U.S. Attorney's Office, Hunsicker's fraudulent scheme continued into 2025 after the Board allowed her to continue as CEO despite being advised by Hunsicker of her wrongdoing.

11.    The complete abdication of responsibility by Hennessy, Callon, and various CaaStle officers, as well as the knowing participation in the scheme by others, caused substantial harm to CaaStle.

12.    CaaStle, formerly known as Gwynnie Bee, Inc. (collectively "CaaStle" or the "Company"), is a Delaware corporation that operated a full-service online platform that enabled rental subscription and e-commerce services for women's apparel brands.

13.    Hunsicker founded CaaStle and served as both a member of its Board of Directors (the "Board") and its Chief Executive Officer from CaaStle's inception until her resignation as a member of the Board on December 15, 2024, and her resignation as CEO on March 23, 2025.

14.    Hunsicker's rise and fall are well documented. In December 2024, after soliciting over $600 million in total equity capital from over 900 shareholders, Hunsicker admitted to members of the Board that she had been preparing and sharing falsified financial data with CaaStle's Board and its existing and prospective investors. Hunsicker's misconduct began no later than February 2019 and continued until March 2025 (the "Relevant Period").

15.    In July 2025, Hunsicker was indicted on fraud charges in the United States District Court for the Southern District of New York. On or about March 4, 2026, Hunsicker pled guilty to

4

one count of securities fraud, and is subject to forfeiture of nearly $300 million in proceeds from her illegal scheme.

16. During the Relevant Period, CaaStle's Board and executives consciously disregarded their duties to the Company, allowing Hunsicker to exercise complete, unchecked control over CaaStle's finances and investor communications, creating the environment in which Hunsicker could perpetuate a fraud in excess of $293 million that caused financial and existential harm to CaaStle.

17. As Directors, Hennessy and Callon were charged with, and responsible for, implementing a functioning governance structure, functioning controls (including the segregation of duties) and reporting processes. Unfortunately, they failed to oversee CaaStle and monitor its operations and financial performance in any discernible manner, relinquishing virtually all of their governance duties to Hunsicker.

18. Despite Hennessy's intimate knowledge of Alphabet's sophisticated Board structure, and Callon's newsworthy expertise in corporate governance, the Board failed to establish the most basic systems and guardrails to protect CaaStle and ensure its core activities—including raising over $600 million in equity investment—were legally compliant.

19. Remarkably, Hennessy and Callon failed to constitute an audit committee or even informally review CaaStle's audited financial reports. This was so despite Hennessy serving as the Chairman of Alphabet, which has an audit committee.

20. Indeed, the Board was so willfully ignorant as to *any* details regarding CaaStle's financial reporting that they did not even know that CaaStle's longtime audit firm terminated CaaStle as a client in 2023 after an investor informed the audit firm that Hunsicker had doctored financial records.

21.     Furthermore, Hennessy and Callon permitted Hunsicker to implement a reporting structure that kept other officers in the dark, convened Board meetings infrequently and irregularly, kept almost no meeting minutes, and lacked virtually any communication with the Company's officers and executives other than Hunsicker.

22.     CaaStle did not benefit from Hunsicker's misconduct, or the enabling conduct of Hennessy and Callon. Rather, CaaStle was the victim. Hunsicker used CaaStle's equity capital to its detriment by, among other things, engaging in self-dealing and facilitating suspicious insider redemptions, all while CaaStle's financial position deteriorated without a proven or sustainable business model. Hennessy's and Callon's willful blindness not only enabled Hunsicker's fraudulent conduct, but prevented CaaStle from righting the ship by, for instance, identifying new and more sustainable lines of business, funding profitable growth, making investments in durable infrastructure, or implementing a feasible restructuring.

23.     CaaStle's officers, too, deliberately disregarded their duties and even assisted Hunsicker in carrying out her fraudulent scheme.

24.     When "Head of Finance" Chirag Jain and Financial Controller Dayna Corlito discovered evidence of Hunsicker's fraud in October 2023—marking the end of CaaStle's engagement with its auditing firm—they chose to work in concert with Hunsicker to conceal her fraud. Their active concealment of Hunsicker's fraud starting in October 2023 allowed Hunsicker to continue defrauding investors for more than a year.

25.     Hunsicker was further assisted by outside counsel Lori Hoberman, who misrepresented facts to investors by telling them that CaaStle did not maintain audited financial statements, and assisted in the coverup of Hunsicker's fraud by facilitating the buyback of a defrauded investor's stock concealed from third-parties via a nondisclosure agreement.

6

#125534859v1

26.     In total, the complete abandonment of the fiduciary duties owed to CaaStle by its directors and officers enabled Hunsicker to secure and misdirect roughly $293 million in investor capital under false pretenses, and ensured CaaStle's financial deterioration and ultimate demise.

**JURISDICTION AND VENUE**

27.     On June 20, 2025, CaaStle filed for voluntary relief under Chapter 7 of the Bankruptcy Code. The Trustee has been appointed as the Chapter 7 trustee for CaaStle's bankruptcy estate.

28.     This Court has jurisdiction over the claims raised in this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference issued by the United States District Court for the District of Delaware on February 29, 2012.

29.     This is a core proceeding pursuant to 28 U.S.C. § 157(b) such that the Court may enter a final order consistent with Article III of the United States Constitution. Pursuant to Rule 7012-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), Plaintiff consents to the entry of a final order by the Court in connection with this Complaint to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

30.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Further, the Trustee consents to venue in this Court.

31.     This is an adversary proceeding brought pursuant to Rule 7001 of the Bankruptcy Rules.

**THE PARTIES**

32.     Plaintiff is the duly appointed Chapter 7 Trustee for CaaStle's Estate.

7

33. CaaStle is a Delaware corporation that at all relevant times purported to operate a full-service platform that enabled rental subscription and e-commerce services for women's apparel brands.

34. Defendant Hunsicker is an individual who, upon information and belief, resides at 15 Monroe Road, Lafayette, New Jersey 07848.

35. Hunsicker founded CaaStle. She served as a member of CaaStle's Board from CaaStle's inception until she resigned from the Board on December 15, 2024. Hunsicker also served as CaaStle's CEO from CaaStle's inception until she resigned as CEO on March 23, 2025.

36. Defendant Callon is an individual who, upon information and belief, maintains a dwelling in the United States at 12598 Fredericksburg Drive, Saratoga, California 95070.

37. Callon is a partner in, and CEO of non-party Ichigo Asset Management, Ltd. ("Ichigo") and served as a member of CaaStle's Board from May 2014 until he resigned in April 2025.

38. Defendant Hennessy is an individual who, upon information and belief, resides at 207 Stockbridge Avenue, Atherton, California 94027.

39. Hennessy served as a member of CaaStle's Board from April 13, 2017, until December 6, 2024, when he sent a letter to CaaStle's General Counsel purporting to retroactively resign from the Board effective April 12, 2021.

40. Hennessy currently serves as the Chairman of the Board of Alphabet, Inc. (formerly Google).

41. Defendant Jaswinder Pal Singh ("Singh") is an individual who, upon information and belief, resides at 251 W. 19th Street, Unit 10D, New York, New York 10011.

8

42.     Singh co-founded CaaStle and served as its Chief Technology Officer and a member of its Board from CaaStle's inception until 2017. Singh rejoined CaaStle's Board on December 15, 2024, following Hunsicker's resignation from the Board.

43.     Defendant Chirag Jain ("Jain") is an individual who, upon information and belief, resides at W-12/39, Western Avenue, Sainik Farms, New Delhi DL 110062 India.

44.     Jain has served as an officer for CaaStle since July 16, 2012, including serving in the roles of Senior Vice President and Corporate Secretary. In 2015, Jain assumed the role of CaaStle's Head of Finance. Prior to joining CaaStle, Jain had never served in any finance role with any company. Despite lacking education, training, or experience in finance or accounting, Jain has been the highest-ranking finance executive at CaaStle since 2015.

45.     Defendant Dayna Corlito ("Corlito") is an individual who, upon information and belief, resides at 9 Cedar Lane, Hampton Bays, New York 11946.

46.     Corlito has served as CaaStle's Financial Controller since February 2018. Corlito reported to Jain and was CaaStle's primary contact for its auditors.

47.     Georgiy Goldenberg a/k/a George Goldenberg ("Goldenberg") is an individual who, upon information and belief, resides at 147 Del Monte Ave, Los Altos, California 94022.

48.     Goldenberg served as CaaStle's Vice President for Technology, Data and Operations until he was promoted to Chief Operating Officer ("COO") on October 12, 2022. On January 10, 2025, Goldenberg was appointed to CaaStle's Board. In March 2025, following Hunsicker's resignation as CaaStle's CEO, Goldenberg was appointed Interim CEO.

49.     Defendant Lori Hoberman ("Hoberman") is an individual who, upon information and belief, resides at 95 Dogwood Avenue, Roslyn, New York 11576.

#125534859v1

50.     Hoberman and her law firm, Defendant Hoberman Law Group PLLC, served as CaaStle's outside counsel during the Relevant Period and represented CaaStle in corporate matters. Upon information and belief, Hoberman Law Group PLLC's principal office is located at 85 Fifth Avenue, New York, New York, 10003.

## RELEVANT NON-PARTIES

51.     BDO USA ("BDO") was engaged by CaaStle to prepare annual audited financial statements from 2015 until October 3, 2023.

52.     BDO learned of Hunsicker's fraudulent activities in or around October 2023 and terminated its relationship with CaaStle based on such fraudulent activities.

53.     Cerini & Associates ("Cerini") was engaged by CaaStle to serve as auditor following the October 3, 2023, termination of CaaStle's engagement with BDO.

54.     Felice Gray-Kemp ("Gray-Kemp") served as CaaStle's General Counsel and a member of its management team beginning in March 2021.

55.     P180 Inc. ("P180") is an entity co-founded by Christine Hunsicker and was publicly described as a platform to leverage CaaStle's proprietary rental technology in support of consumer brands.

56.     CaaStle India is CaaStle's Indian subsidiary, established as a completely independent services business. CaaStle India was funded entirely by CaaStle, initially to serve a single client, CaaStle, but later additionally serving P180.

57.     CaaStle India provided customer service, finance, and all back-office services and support to CaaStle, expanding to hundreds of employees at its peak.

58.     The Board of CaaStle India was comprised solely of Chirag Jain and his wife. The CaaStle India Board never held any meetings because, as testified to by Jain, there was no Board

10

oversight of CaaStle India. Jain served as the de facto head of CaaStle India and reported directly to Goldenberg on CaaStle India matters.

## FACTUAL BACKGROUND

### A.    CaaStle's Formation and Corporate Structure

59.    CaaStle was previously known as Gwynnie Bee, Inc. ("Gwynnie Bee").

60.    On September 9, 2011, Gwynnie Bee was incorporated in the State of Delaware as a limited liability company.

61.    On December 30, 2011, Gwynnie Bee was converted to a C corporation.

62.    On November 5, 2018, Gwynnie Bee changed its name to CaaStle, Inc.

63.    CaaStle is governed by its Certificate of Incorporation and the Bylaws of CaaStle Inc. ("Bylaws"), dated November 5, 2018. True and correct copies of the Certificate of Incorporation and Bylaws are attached hereto as Exhibit A and Exhibit B, respectively.

64.    Under the Bylaws, the powers of CaaStle "shall be exercised, its business conducted and its property controlled by or under the direction of the Board of Directors." *See* Ex. B.

65.    The Bylaws provide that there shall be an annual meeting of the Board of Directors for purposes of electing officers and transacting such other business as may lawfully come before it, as well as regular meetings. *See* Ex. B.

66.    The Bylaws also provide for the appointment of officers, including a Secretary. The Secretary's duties include attending all meetings of the Board of Directors, and recording all acts and proceedings thereof in the minute book of the corporation. *See* Ex. B.

### B.    Hunsicker's Fraud

67.    Beginning no later than February 2019 until her indictment in July 2025, CaaStle's CEO Christine Hunsicker knowingly, deliberately, and repeatedly falsified financial statements and

11

documents audited by BDO. Hunsicker shared doctored financial documents with investors, prospective investors, and the Board of Directors.

68.    These falsified documents significantly inflated CaaStle's revenue figures and other financial metrics.

69.    These falsified documents were used by Hunsicker to secure nearly $300 million in investor capital.

70.    Hunsicker did not raise investor capital under false pretenses for the benefit of the Company. Rather, Hunsicker completely abandoned the Company's interests.

71.    Hunsicker facilitated questionable insider stock redemptions at artificially inflated share valuations, including for herself, Goldenberg, and Singh. *See infra* at ¶¶ 216-224, 335-361.

72.    While CaaStle was raising massive amounts of capital as a result of Hunsicker's misconduct, its operating losses only deepened, and cash reserves dwindled, during the Relevant Period.

73.    By way of illustration, between 2019 and 2024, CaaStle raised over $300 million of equity capital, yet its cash reserves deteriorated from $13.6 million in 2019, to just $4.3 million in 2024.

74.    In 2024, CaaStle spent a record $118 million in cash: $80 million (the second highest in the Company's history) was spent on operations; over $10 million for unjustified transfers to P180; and a staggering $21.5 million on equity redemptions.

75.    In summary, Hunsicker perpetuated an unsustainable business model in which revenue was never able to meet CaaStle's operational needs; indeed, CaaStle's very existence depended on continuous fundraising efforts. This hand-to-mouth existence was ultimately brought

#125534859v1

to an end by Hunsicker's self-dealing and facilitation of equity redemptions at questionable share prices.

76.     The first known instance of Hunsicker falsifying financial disclosures involved the dissemination of a fabricated income statement for the fiscal year ending December 31, 2018, which was used to support investment discussions. That falsified statement presented revenue of $71 million when actual revenue was closer to $24 million.

77.     Subsequent falsified reports presented similarly inflated revenue figures:

a.     2019: $90 million (actual $28 million)

b.     2020: $93 million (actual $21 million)

c.     2021: $144 million (actual $14 million)

d.     2022 (YTD Q3): $192 million (actual $15 million)

78.     Internal records confirm these fabricated numbers were additionally supported by tampered financial reports, including at least one altered BDO audit report.

79.     Hunsicker engaged in a pattern of preparing, editing, and forwarding fraudulent reports continuously through March 2025.

80.     Hunsicker, in addition to outside counsel, Lori Hoberman, at times falsely told prospective investors that CaaStle did not maintain audited financial reports.

81.     For example, in 2021, Hoberman communicated with a potential investor, Tech Pioneers Fund, in relation to the purchase of CaaStle shares.

82.     When asked by Tech Pioneers Fund about CaaStle's audited financial statements, Hoberman represented to the investor that CaaStle does not maintain audited financials.

13

83.     However, Hoberman knew that BDO was retained for the specific purpose of auditing CaaStle's financial statements. In fact, in at least 2017 and 2018, Hoberman assisted CaaStle with collecting information necessary for BDO to complete audits for those fiscal years.

84.     As a result of Hoberman's misrepresentation, CaaStle did not provide audited financial statements to Tech Pioneers Fund before accepting its money.

85.     In December 2022, Hunsicker knowingly distributed a falsified BDO audit report to potential investors, grossly inflating reported revenues to $120.5 million for 2021 (actual $14 million) and to $90.0 million for 2020 (actual $21 million).

86.     In April 2023, Hunsicker knowingly circulated a second falsified audit report, falsely claiming revenues of $238.5 million for 2022 (actual $19 million) and $120.5 million for 2021 (actual $14 million).

87.     These figures were deliberately fabricated and in stark contrast to CaaStle's actual revenues.

88.     The financial documents falsified by Hunsicker were not isolated to a single metric such as revenue. Rather, the manipulated figures were extended across the income statement, balance sheet, and statement of cash flows.

**C.    The Directors Consciously Disregarded and Abandoned Their Duties of Oversight to CaaStle**

89.     In their capacities as Directors of CaaStle, Hennessy and Callon failed to implement reporting and control systems to provide them with timely and accurate information addressing central compliance risks. Instead, the Directors blindly deferred to Hunsicker and passively accepted cherry-picked information provided by her during sporadic Board meetings.

**a.  Hennessy and Callon Failed to Implement an Audit Committee or Review Audited Financial Reports**

14

90.    Hennessy and Callon's most conspicuous failure related to the structure of the Board itself, which lacked any demonstrable governance architecture.

91.    The Board failed to create any committees or devote special attention to central and essential corporate objectives such as fundraising.

92.    CaaStle's existence depended almost exclusively on equity financing. Between its inception and 2025, CaaStle raised over $600 million in capital on a continuous basis.

93.    Yet the Board failed at all times to constitute an audit committee to oversee the Company's financial reporting, internal controls, and auditing processes.

94.    Indeed, the only audited financial information Hennessy and Callon ever viewed was provided by Hunsicker in slide decks circulated for Board meetings. That information was, at times, falsified by Hunsicker.

95.    For example, in November 2023, Hunsicker sent the Board a deck overstating cash on hand by over $100 million. The deck stated that CaaStle held nearly $113 million when in reality it held just over $2 million. The Board was so detached from the Company that they failed to suspect anything was amiss or request documentation supporting the false and highly inflated financial metrics contained in the deck.

96.    It would have taken only the slightest effort for Hennessy and Callon to verify the information provided by Hunsicker and ensure CaaStle's ongoing fundraising activities were legally compliant.

97.    Hennessy and Callon never requested to review or saw any complete audit report prepared by BDO between 2015 and 2023.

15

98.    Hennessy and Callon were so disconnected from the financial condition of CaaStle that they did not even know that BDO terminated CaaStle as a client in October 2023 after learning that Hunsicker provided a fabricated audit document to an investor.

99.    Hennessy and Callon consciously disregarded CaaStle's financial condition and audit process, despite knowing the central role fundraising played in CaaStle's operations, and the significant compliance risks associated therewith.

### b.   The Board Failed to Implement other Internal Controls

100.    The Board permitted Hunsicker to structure CaaStle's internal operations to minimize cross-functional visibility and accountability. She created silos to effectuate distance between CaaStle's operational team and the Board.

101.    Critical functions such as communications with the Board of Directors and investors, and concerning fundraising were all handled directly by Hunsicker with virtually no input from the broader management team.

102.    The Board's disregard of its duty to institute anything resembling a rational corporate governance structure facilitated Hunsicker's five-year pattern of fraud.

103.    The structure, internal controls, and reporting processes at CaaStle were virtually non-existent.

104.    For example, despite their roles as Vice President for Technology, Data and Operations (and later Chief Operating Officer) and Head of Finance, respectively, Goldenberg and Jain were excluded from investor-facing communications.

105.    In addition, there is no record establishing that executives and officers, such as Goldenberg, Jain, Gray-Kemp, or Corlito ever attended Board meetings or presented to the Board during the Relevant Period.

#125534859v1

106.     These executives apparently were not involved in preparing or reviewing materials shared with the Board.

107.     Jain, as Corporate Secretary, failed to record Board meetings for all or most meetings, until after Hunsicker admitted to fraud and attorneys from the law firm of Cravath, Swaine & Moore LLP ("Cravath") began attending Board meetings.

108.     Similarly, other than Hunsicker, no Board member communicated substantively with any member of the CaaStle operations or executive team about CaaStle's business operations, legal operations, or finance.

109.     In fact, Gray-Kemp, CaaStle's General Counsel, apparently did not know who served on CaaStle's Board and had never communicated with the members of the Board prior to December 2024.

110.     Upon information and belief, the first time Gray-Kemp engaged with Hennessy and learned he was on the Board was when she received his December 6, 2024, letter of resignation. Similarly, upon information and belief, the first time Gray-Kemp engaged with Callon and learned he was on the Board was on December 8, 2024.

111.     In addition to the lack of communication between members of CaaStle's Board and officers, CaaStle's officers and executives apparently had different views as to the Company's internal reporting structure and the scope of their responsibilities.

112.     Upon information and belief, Jain believed that as Head of Finance, he was expected to report to Goldenberg, rather than directly to Hunsicker. Yet documents reveal that he did in fact report directly to Hunsicker in his role. Conversely, Goldenberg apparently believed that his authority did not extend to CaaStle's finance department, and that Jain's reports only pertained to CaaStle's Indian subsidiary.

17

113.    By way of further example, despite being the Chief Operating Officer beginning in 2022, Goldenberg had no oversight of CaaStle's finances, and deferred to Hunsicker to provide investor updates and frame CaaStle's financial position to employees and the Board. CaaStle's finance employees bypassed Goldenberg and reported directly to Hunsicker, leaving the COO in the dark as to critical financial developments and allowing Hunsicker to misrepresent the Company's financial position to investors, employees, and the Board.

114.    Due to the total breakdowns in CaaStle's reporting structure, Goldenberg was not even aware that, in November 2023, Hunsicker shared a slide deck with the Board claiming that its revenue was over fifty times greater than actual revenue. A true and correct copy of the slide deck shared with the Board in November 2023 is attached hereto as Exhibit C.

115.    Additionally demonstrating the Board's failure to ensure effective financial reporting, Callon and Hennessy permitted Chirag Jain to serve as "Head of Finance," despite Jain lacking *any* prior educational or work experience in finance or accounting. Jain reported directly to Hunsicker for many crucial activities such as investor issues.

116.    Neither Hennessy nor Callon ever noticed these fundamental shortcomings in CaaStle's governance structure, or attempted to implement a more functional and transparent system.

117.    In short, the Board's continuous failure to implement controls or adequately oversee the Company's affairs included:

   a.    The failure to convene Board meetings with any regularity. For example, the Board went over a year without a meeting (from August 14, 2019 to September 3, 2020) around the time that Hunsicker began defrauding investors.

18

#125534859v1

b.  The failure to maintain minutes for almost all of its sporadic meetings between 2015 and 2025. Upon information and belief, neither Hennessy or Callon requested a copy of meeting minutes at any time.

c.  As a result of the Board's failure to insist on a reasonable corporate structure for the Company, the Board only ever received presentations and reports from Hunsicker. The Board did not request, nor did Hunsicker permit, other CaaStle officers or employees (including Head of Finance Chirag Jain and Chief Operating Officer Georgiy Goldenberg) to speak at Board meetings.

d.  Investor outreach and fundraising was handled almost exclusively by Hunsicker, which permitted her to mispresent the Company's financial position with impunity. Executives including Goldenberg, Jain, and Corlito were excluded from investor-facing communications.

e.  The Board permitted CaaStle to appoint Chirag Jain, an individual lacking any education or experience in finance or accounting, to serve as CaaStle's Head of Finance. The Board neither vetted Jain's fitness to serve in this critical financial role, nor met or spoke with Jain at any subsequent time.

f.  The Board itself lacked any demonstrable governance architecture. Most notably, the Board failed at all times to constitute an audit committee to oversee the Company's financial reporting, internal controls, and auditing processes. The Board never requested or reviewed any audit report prepared by BDO between 2015 and 2023.

g.  Relatedly, the Board never requested any information to substantiate claims made by Hunsicker about the Company's financial performance, and it simply relied on

19

the information presented by Hunsicker. For example, in November 2023, Hunsicker sent the Board a deck overstating cash on hand by over $100 million. The Board was so detached from the Company that it failed to suspect anything was amiss or request documentation supporting the false and highly inflated financial metrics contained in the deck.

   c. **The Board's Failures Enabled and Encouraged Hunsicker's Fraud, and the Board Failed to Act Appropriately after Discovering the Fraud**

118.   If the Board had proper corporate structure and reporting systems in place, it would have detected and prevented Hunsicker's scheme.  At a minimum, it would have discovered Hunsicker's fraud, which started in 2019, earlier than it did, but under no circumstances later than October 2023.

119.   Because there was no audit committee, the Board was not even aware that BDO had terminated its engagement with CaaStle. Instead, BDO reported to Corlito, who was appointed by Hunsicker to manage CaaStle's relationship with the auditing firm. As such, in October 2023 when BDO discovered the falsified 2022 audit report, rather than reporting it to an audit committee, BDO reported the discovery to Corlito. This improper structure put Hunsicker in the position to conceal her fraud for another year.

120.   Even in the absence of an audit committee, if the Board had even once requested to review CaaStle's audited financial reports with Caastle's auditors, it would have realized the numbers Hunsicker shared in the November 2023 slide deck were incorrect.

121.   Furthermore, Hunsicker was aware of the fact that the Board was totally disengaged from corporate affairs and did not oversee Hunsicker's fundraising efforts or the Company's audit reports. Stated differently, Hunsicker was emboldened to act because she knew the Board

members—who essentially just collected checks and disappeared in the time between Board meetings—would not catch on to her conduct.

122.    When the Board finally acknowledged Hunsicker's fraud in December 2024, the Board failed to act in the best interests of the Company. On December 6, 2024, just three days after an investor raised questions with Hennessy about a discrepancy in a falsified audit report provided by Hunsicker, Hennessy turned tail and abandoned the Company entirely.

123.    That day, Hennessy sent a letter to Gray-Kemp, CaaStle's General Counsel, claiming that his four-year term on the Board terminated on April 12, 2021. Hennessy asserted that his letter should be construed as a retroactive resignation, effective April 12, 2021.  A true and correct copy of Hennessy's letter is attached hereto as Exhibit D.

124.    Notwithstanding this purported retroactive termination, Hennessy was demonstrably acting in his capacity as a Director well into 2024. Hennessy attended Board meetings and received Board materials in advance of Board meetings as late as October 31, 2024. Moreover, Hennessy held himself out as a Board member in communications with investors between June and December 2024.

125.    On December 8, 2024, Hunsicker admitted her fraud to Callon and Singh. Singh was appointed as a Director shortly thereafter.

126.    Callon and Singh (who was appointed to the Board by Callon at Hunsicker's insistence as a term of her resignation) ignored the best interests of the Company and inexplicably permitted Hunsicker to remain as CaaStle's CEO for *more than three months*. At that point, the only remaining Directors were Callon and Singh, both of whom were on the call when Hunsicker admitted that she had, for years, been falsifying the financial results that she shared with the Board and investors.

21

#125534859v1

127.    According to the U.S. Attorney's Office, Hunsicker's fraudulent conduct continued well into 2025. Indeed, in February 2025, Hunsicker attempted to sell an additional $19 million of her CaaStle shares to an investor. She even persisted after law enforcement seized her electronic devices in March 2025, continuing to meet with an investor about a fake audit without revealing its fraudulent nature, her removal from the Board, or the prohibition against her selling shares.

**D.    Investors Catch on to Hunsicker's Fraud**

### a. BDO Terminates CaaStle after Learning Hunsicker Sent A Fabricated Audit Report to An Investor

128.    Due to constant cashflow struggles, CaaStle had a pattern of falling behind on paying its bills, including invoices from BDO.

129.    In March 2023, BDO took exception to CaaStle's failure to pay its invoices.

130.    As a result, pending payment of the outstanding invoices, BDO paused its audit of CaaStle for the 2022 fiscal year (the "2022 Audit").

131.    During this period that BDO paused the 2022 Audit, Hunsicker was fielding questions from concerned investors about delays in the provision of information, as well as discrepancies in CaaStle's financials and capitalization table or "cap table."

132.    On April 4, 2023, a representative of an investor ("Investor A") requested an explanation for why a cap table share count from the 2021 audit differed from the most recently provided information.

133.    The representative also asked to be put in contact with the BDO partner in charge of the 2022 Audit.

134.    In response to  this request, Hunsicker provided a draft of the 2022 audit and stated that any discrepancies were due to a "cleanup" of the cap table.  Hunsicker also told the representative she had asked for the name of the BDO partner in charge.

22

135.    On May 5, 2023, the investor representative followed up with Hunsicker to request a current cap table and the finalized 2022 Audit.

136.    Hunsicker responded to the follow up, stating that "[t]he audit isn't finalized, but I expect it next week or the week after at the latest. I just did the call with auditors where they ask the regulatory questions in order to finalize."

137.    When Hunsicker sent this response, BDO had not resumed the 2022 Audit.

138.    On September 24, 2023, Hunsicker forwarded to the representative what she claimed was the finalized 2022 Audit. However, this was a fraudulent document containing a forged BDO signature.

139.    On Friday, September 29, 2023, a second representative of the same investor emailed the BDO audit partner asking  him to "please confirm that BDO did in fact conduct and complete the attached [2022] audit document?"

140.    After receiving the email, the BDO partner called Dayna Corlito, CaaStle's Financial Controller, and informed her that BDO received a document that appears to be from BDO but is not.

141.    Following their call, the BDO partner emailed the fraudulent document to Corlito, who knew BDO had not completed the 2022 Audit.

142.    Also on September 29, 2023, upon receiving a copy of the fraudulent document from BDO, Corlito called Jain to tell him she received a call from the BDO partner regarding a false version of the 2022 Audit that had been sent to an investor.

143.    At a time no later than when he received this information from Corlito, Jain knew the audit was fake and that BDO had not completed the 2022 Audit.

144.    On the same day, September 29, 2023, Jain contacted Hunsicker about the fraudulent BDO report. Hunsicker told Jain that one of the investors was asking BDO to confirm audits. She did not want BDO talking to investors, so she asked Jain to confirm that BDO could not speak with investors without CaaStle's approval.

145.    Jain responded that he had asked Corlito to discreetly check industry practice to confirm that BDO would need to check with CaaStle before giving CaaStle's investors any information.

146.    Hunsicker and Jain then devised a plan to pay BDO outstanding amounts to "reinforce no talking" and prevent audit reports from being shared with investors.

147.    Jain advised Hunsicker that BDO was requesting Board minutes. As CaaStle's Corporate Secretary, Jain knew that he had not taken or maintained any Board minutes, yet he advised Hunsicker of the request anyway.

148.    On Monday, October 2, 2023, Jain, Hunsicker, Corlito, and the BDO partner held a teleconference and discussed BDO's termination of its engagement with CaaStle.

149.    On the call, Hunsicker admitted that she deliberately merged two documents and switched out the signature page from a signed version with a draft version.

150.    Jain did not report the event to anyone, including the Board.

151.    On October 3, 2023, the BDO partner called Corlito and told her BDO was terminating its engagement with CaaStle, explaining thatBDO's counsel would not permit the engagement to continue after a financial document had been falsified.

### b. Hunsicker, with the assistance of Jain and Corlito, Cover Up the BDO Termination and Engage Cerini

152. After the call with BDO, Hunsicker asked Jain whether they should involve CaaStle's General Counsel, and stated maybe they should "take out the part about them not being allowed to talk to investors," and that the rest is in the paperwork.

153. Jain asked whether Hunsicker should speak with "Lori." Hunsicker responded "Not Lori. Then it will need to be disclosed in funding docs." "Lori" is believed to be a reference to Lori Hoberman of Hoberman Law Group, who represented CaaStle in corporate matters.

154. Even after Hunsicker told Jain that BDO's termination of its engagement with CaaStle was a reportable event, Jain kept the situation a secret from CaaStle's in-house and outside counsel, other officers and executives, the Board, investors, and prospective investors.

155. Even though Hunsicker told Jain not to inform Hoberman of the event, Hunsicker nevertheless informed Hoberman shortly thereafter and enlisted her help in concealing the event from investors. *See infra,* ¶¶ 143-150.

156. Later in the day on October 3, 2023, BDO sent a formal termination letter to Hunsicker, Jain, and Corlito, explicitly citing CaaStle's provision of a "falsified version of the Company's financial statements to certain investors."

157. Following the termination of their relationship with BDO, Jain directed Corlito to falsely tell anyone who inquired that CaaStle was switching auditors merely as a cost saving measure.

158. Corlito proceeded to give this excuse for the change in auditors to CaaStle's officers, including Goldenberg, despite knowing the true reason CaaStle was switching auditors was that BDO discovered Hunsicker had falsified the 2022 Audit report.

25

159.    After CaaStle's relationship with BDO was terminated on October 3, 2023, the Company engaged Cerini to serve as auditor. This process of engaging a new auditor was led by Jain and Corlito.

160.    In anticipation of engaging Cerini to finish the 2022 Audit and perform an audit for the 2023 fiscal year, Jain and Corlito responded to a questionnaire sent by Cerini.  A true and correct copy of the questionnaire is attached hereto as Exhibit E.

161.    When asked by Cerini if the CaaStle Board had an audit committee, Jain and Corlito responded "No, but there is a Board. Any presentation would be to management, if at all[.]" *See* Ex. E ¶ 2

162.    Moreover, when asked by Cerini if "there have been any recent frauds," Jain and Corlito responded "No[.]" Ex. E ¶ 7.

163.    Both Jain and Corlito knew when they completed this questionnaire that responding "no" to the question inquiring about recent frauds was a misrepresentation.

164.    On October 10, 2023, Hunsicker contacted Callon to say she is "finally setting up a board meeting." Hunsicker further stated, "[a]nd, to stop this from happening again, I'd like to calendar the whole year," apparently referring to the Board's failure to meet for an extended period of time.

### c.  Hunsicker, with the assistance of Hoberman, Furtively Executes a "Gag Order" with Investor A

165.    Despite Hunsicker telling Jain not to tell outside counsel Lori Hoberman about the incident leading to CaaStle's termination by BDO, Hunsicker herself involved Hoberman in the fallout.

#125534859v1

166. On October 10, 2023, one week after BDO terminated CaaStle, Lori Hoberman introduced Hunsicker via email to Michael Shuster, co-founder of the New York law firm Holwell Shuster & Goldberg LLP.

167. Hunsicker retained Shuster on behalf of CaaStle for the purpose of negotiating a settlement and release agreement with Investor A, which had received the falsified audit.

168. CaaStle and Investor A eventually agreed that CaaStle would repurchase all of Investor A's holdings in the Company for cash, a release of all claims against CaaStle, and a promise to not disclose Hunsicker's provision of falsified CaaStle financials. No evidence exists that the directors and officers obtained credible information that would have enabled the evaluation of the reasonableness of the repurchase amount CaaStle paid to Investor A. Upon information and belief, the redemption amount represents the amount Investor A invested in CaaStle and had no basis in reality or the market value of the shares at this or any other point in time during the Relevant Period.

169. Hoberman was actively involved in discussions with Hunsicker and Shuster related to the negotiations with Investor A, and Hoberman made several revisions to the draft settlement and release agreement, which included a term preventing Investor A from disclosing Hunsicker's actions. Hoberman was also involved in ensuring that CaaStle's payments to Investor A were made timely.

170. On October 17, 2023, Hunsicker asked Schuster to confirm that the settlement agreement "is effectively a gag order, correct?"

171. On October 24, 2023, Hunsicker wrote to Hoberman and Shuster that the Board will need to "approve the transaction" at an upcoming meeting, which was scheduled for November 2, 2023.

#125534859v1

172. Hunsicker asked Schuster to revise the settlement agreement to provide her time to obtain Board approval for the repurchase.

173. On November 2, 2023, Hunsicker sent a slide deck to the Board of Directors, including Callon and Hennessy, in advance of that night's Board meeting.

174. The deck contained the financial information that was egregiously wrong. For example, the deck overstated CaaStle's cash on hand *fifty-five-fold,* telling the Board that CaaStle held nearly $113M in cash when in reality it held just over $2M.

175. The board deck did not include any information related to CaaStle's settlement with Investor A, including the repurchase of shares.

176. No meeting minutes were recorded for the November 2 Board meeting. Thus, it is unclear whether the Board was made aware of the Investor A repurchase, and if so, what reasons Hunsicker provided to the Board.

177. Months after BDO terminated CaaStle, Corlito and Jain continued to discuss whether BDO could reveal Hunsicker's provision of fraudulent financial information. Jain assured Corlito that he was "looking for recourse for us to maintain silence."

**d. Stonecroft Management Discovers Hunsicker's Fraud**

178. Investor A was not the only investor to identify red flags related to information conveyed by Hunsicker.

179. After the conclusion of the Investor A saga, Hunsicker continued to receive communications from concerned investors who noted discrepancies in CaaStle's financial information.

180. On June 5, 2024, Hennessy forwarded an email to Hunsicker and Singh sent by Jed Lenzner of Stonecroft Management LLC ("Stonecroft") requesting information regarding his and

28

Henry Kravis' investment in CaaStle. This was months before Hennessy's attempt to retroactively resign from the board.

181.    In the forwarded email, Hennessy also noted that the Directors "haven't had a board meeting in ages." Indeed, the Board had not met in over seven months, since November 2, 2023.

182.    On October 8, 2024, Hunsicker had lunch with Jed Lenzner, Ryan Josephson, and Olivia Schmidt of Stonecroft Management in New York.

183.    On October 14, 2024, Stonecroft met with Hunsicker and requested that Hunsicker send a "data room."

184.    On October 21, 2024, Stonecroft followed up with Hunsicker, noting that "the last set of financials you shared with us is from October 2023." Hunsicker promised to provide updated financial information to Stonecroft.

185.    On November 16, 2024, Stonecroft emailed Hunsicker requesting another in-person meeting.

186.    On November 20, 2024, Stonecroft asked Hunsicker to connect with BDO. Even though BDO had terminated CaaStle as a client over a year earlier, Hunsicker told Stonecroft she was "working on it."

187.    On November 21, 2024, Hunsicker engaged counsel to represent her personally "in connection with an issue concerning [her] conduct in connection with one of CaaStle's investors," presumably Stonecroft.

188.    On November 27, 2024, Stonecroft emailed Hennessy, and advised that on October 30, 2024, it reviewed an August 20, 2024 audit purportedly signed by BDO.

189.    Stonecroft noted that page 7 of the audit report was missing, and that Hunsicker's explanation was unsatisfactory.

29

#125534859v1

190. Hunsicker followed up with Stonecroft and offered to repurchase its shares in CaaStle.

191. On December 3, 2024, Stonecroft participated in a call with Hennessy and Callon during which it was observed that the missing page of the audit report was incorrect by $13 million.

192. Just three days later, Hennessy sent his remarkable letter to Gray-Kemp purporting to resign from the Board retroactively.

### E. Hunsicker Admits her Fraud to the Remaining Directors

193. On December 8, 2024, under mounting pressure, Hunsicker admitted to Singh and Callon that she had been falsifying and sharing financial statements for years.

194. Hunsicker told them that she believed there was a path for CaaStle to become profitable, but that she just needed time.

195. She stated that she had taken on a $20 million loan to finance CaaStle, and that she expected another $10 million in new investments.

196. Also on December 8, 2024, Callon emailed Gray-Kemp and requested copies of CaaStle's articles of incorporation, bylaws, and capitalization table. Upon information and belief, this was the first time Gray-Kemp engaged with Callon and learned he was on the Board.

197. On December 12, 2024, Hunsicker sent herself successive versions of a document called "Proposal."

198. These documents—which, upon information and belief, were not shared with Singh or Callon—were Hunsicker's attempt to provide a positive spin on her contemporaneous account of her conduct, and to excuse her conduct as the unfortunate result of a head injury suffered in 2017.

199. On or about December 12, 2024, Callon asked for Hunsicker's resignation.

200.    Hunsicker countered that she would only resign if Singh was added to the Board.

201.    On December 14, 2024, Callon agreed to the terms dictated by Hunsicker: Callon agreed to appoint Singh to the Board in exchange for Hunsicker's resignation.

202.    On December 18, 2024, Callon as the sole director of CaaStle, noted the resignation of Hunsicker and Hennessy from the Board, and appointed Singh to fill one of the vacancies.

203.    On January 3, 2025, the CaaStle Board (consisting of Singh and Callon) held a meeting with counsel from Cravath present.

204.    The minutes reflect that Singh and Callon discussed the state of the underlying business, and in particular that P180 showed promise: "Mr. Singh reported that Ms. Hunsicker and Mr. Jain had been developing plans for a restructuring of the business to focus solely on the P180 business. The Board was in agreement as to this proposed streamlining and restructuring of the business. After discussion, the Board agreed that Ms. Hunsicker and Mr. Jain should finalize a restructuring proposal and present it to the Board."

205.    Astoundingly, Singh and Callon concluded that CaaStle should adopt a business model that required it to work closely with P180, a company with a Board led by Hunsicker.

206.    At the January 3, 2025 Board meeting, Singh and Callon also discussed a succession plan for Hunsicker, but conceded that they lacked the ability to manage and oversee the Company without her.

207.    On January 6, 2025, Hunsicker and Goldenberg met in New York and Hunsicker confessed her fraud.

208.    Shortly after, Callon and Singh issued a Consent of the Board of Directors appointing Goldenberg as the third member of the Board of Directors.

31

#125534859v1

209. Days later, Jain learned that Hunsicker had spoken to Goldenberg and the Board about having engaged in wrongdoing.

210. On March 23, 2025, the CaaStle Board (with a quorum of Singh and Goldenberg) held a meeting and resolved to ask Hunsicker to resign as CEO and to appoint Goldenberg as interim CEO. The same day, Hunsicker resigned as CEO of CaaStle.

211. On April 21, 2025, Callon resigned from the Board.

**F. Ichigo's Loan to Hunsicker**

212. On October 30, 2023, Callon, who is the CEO of Ichigo, directed Ichigo to issue a $5 million personal loan to Hunsicker.

213. Hunsicker told Callon that she only needed the money for one month to allow her to pay amounts due to First Republic Bank on a different loan.

214. However, the loan remained unpaid for almost a year, when Hunsicker wired Ichigo $5.25 million not from her personal account but from CaaStle's bank account.

215. In February 2025, the funds were returned to CaaStle by Ichigo.

**G. Improper Stock Redemptions by Officers and Directors**

216. During the Relevant Period while CaaStle was insolvent and relying on falsified financial statements to raise additional capital, CaaStle authorized a series of transfers to certain officers and directors.

217. Goldenberg is listed on CaaStle's capitalization table as holding 1 million shares of common stock, purportedly acquired in November 2024 for no consideration.

218. In November 2024, Goldenberg redeemed shares for $3 million. The basis for this redemption is unclear.

32

219.    There is no indication that he paid for the shares originally, nor that he received the redemption pursuant to any approved redemption policy or liquidity program.

220.    Singh is listed as holding approximately 36 million shares of common stock, representing 11.9% of the Company's total common equivalent shares.

221.    In October 2024, Singh received $6,000,000 for the sale and/or redemption of CaaStle equity. CaaStle's records provide no justification for this redemption, nor do they indicate that it was offered pursuant to a broader investor liquidity program.

222.    In November 2024, Hoberman and Jain, despite knowing about the fraudulent financials shared with Investor A, reviewed and/or approved a questionable stock redemption in relation to shares allotted to "management personnel" circa 2011 or 2012.

223.    On December 8, 2024, after Hunsicker admitted her fraud to Singh, Singh attempted to cash out additional CaaStle stock by sending a Common Stock Redemption Agreement to Jain.

### H.   Improper Transfers and Free Services Provided to P180

224.    CaaStle also made a number of questionable transfers to P180 during the Relevant Period.

225.    As alleged above, P180 is an entity co-founded by Hunsicker. CaaStle owns a minority stake in P180. Hunsicker, via her holdings in CaaStle, also indirectly possessed a stake in P180.

226.    Beginning in April 2024, CaaStle began transferring funds to P180 totaling approximately $11.2 million, without any substantiated commercial justification such as services rendered, equity investment, or revenue-sharing agreements.

33

227.    In addition to the monetary transfers to P180, Hunsicker directed CaaStle to provide free services to P180. CaaStle India, CaaStle's Indian subsidiary, diverted significant resources to support the technology, customer service, and finance operations for P180. Each month, CaaStle India billed CaaStle for the services rendered to P180. However, neither CaaStle India, nor CaaStle, Inc., ever invoiced P180 for the services provided.

228.    Since 2016, approximately $57.4 million has been paid by CaaStle to CaaStle India purportedly to support the operations of the Indian subsidiary.

## I.    Abandonment of Duty of Loyalty by Chirag Jain

229.    Jain withheld material information from the Board and actively engaged in deceptive conduct when he conspired with Hunsicker to keep her falsification of the 2022 Audit secret from CaaStle's Board and other executives.

230.    Jain first learned that Hunsicker had falsified BDO's 2022 Audit report no later than September 2023. From his first conversation with Hunsicker about the falsified audit report, Jain worked with Hunsicker to keep news of the fraudulent report a secret.

231.    As alleged above, when Jain contacted Hunsicker about the fraudulent BDO report on September 29, 2023, Hunsicker asked Jain to confirm that BDO could not speak with investors without CaaStle's approval.

232.    Jain responded to Hunsicker's request, saying he had already asked Corlito to discreetly check industry practice to confirm that BDO would need to check with CaaStle before giving CaaStle's investors any information. Hunsicker and Jain then devised a plan to pay BDO outstanding amounts to "reinforce no talking" and prevent audit reports from being shared with investors.

#125534859v1

233. Jain and Hunsicker's desire to silence BDO was to keep BDO from telling others about Hunsicker falsifying the audit report. Indeed, in July 2024, nearly a year after Jain and Hunsicker first conspired to keep BDO silent, Jain told Corlito that he was "looking for recourse for us to maintain [BDO's] silence."

234. After BDO terminated its engagement with CaaStle as a direct result of the falsified audit report, Jain continued actively trying to keep the real reason for BDO's termination a secret. He directed Corlito to tell CaaStle's executives that CaaStle was switching auditors to save money.

235. Moreover, when Jain and Corlito hired Cerini as the Company's new auditor, they knowingly lied on a questionnaire provided to Cerini regarding whether there had been any recent fraud at CaaStle.

236. Jain never informed CaaStle's Board or any other executive about Hunsicker's falsification of the 2022 Audit report and the real reason CaaStle's relationship with BDO ended.

237. Jain continued to suppress the information for the purpose of ensuring it would not be disclosed in funding documents shared with investors.

238. As a result of Jain's efforts to keep Hunsicker's fraud silent, BDO, Hunsicker, Jain, and Corlito were the only ones who knew about the incident that led to the termination of BDO's relationship with CaaStle. As such, Jain's and Corlito's efforts allowed Hunsicker to continue defrauding investors for another full year, ultimately culminating in additional harm from Hunsicker's fraud.

239. Jain had a personal interest in facilitating whatever financial maneuvering was necessary to keep CaaStle operational, because, among other reasons, without CaaStle, CaaStle India, the Indian services company that Jain built, staffed, and ran (and for which his wife served as a Board member) would have failed.

35

**J.  Hunsicker's Fraud and the Officers' and Directors' Breaches of Fiduciary Duty Harmed, Rather Than Benefitted, CaaStle.**

240.  As a result of the breaches of fiduciary duty by CaaStle's directors and officers, particularly their failure to oversee the Company's finances and efforts to keep Hunsicker's fraud a secret, CaaStle suffered damages in the form of, among other things, misappropriated corporate funds, diminished enterprise value, and hundreds of millions of dollars of claims by aggrieved investors.

241.  Equity was the Company's primary financial lifeline. From its inception through 2025, CaaStle raised approximately $611.5 million in gross equity financing across multiple funding rounds. Of this amount, at least $293 million in investor capital was raised under false pretenses.

242.  Despite the equity capital it raised, CaaStle's revenue never reached a level sufficient to support its operations. In the fifteen years that CaaStle was operational, it never made money. In fact, operating losses accelerated and ultimately reached a staggering $81 million in 2023 and $72 million in 2024.

243.  In light of this history, Hunsicker began to raise equity capital through fraudulent means.

244.  However, the equity capital Hunsicker raised was not used to save CaaStle. Instead, Hunsicker used the capital to keep CaaStle's failing operations afloat while pillaging the remaining capital through transactions to herself, CaaStle insiders, and affiliated third parties and as hush money to keep those parties who were suspicious of CaaStle's true financial condition silent by redeeming their CaaStle equity holdings.

#125534859v1

245. These transactions (including cash transfers, debt repayments made on behalf of executives, redemptions, and payments to entities with insider affiliations), were made at a time when the Company was insolvent and burning cash at a rapid pace.

246. By way of example, nearly all the equity capital Hunsicker raised was consumed by the Company's negative operational cash flows.

247. Hunsicker's use of the fraudulently raised equity capital to fund CaaStle's existing operations and finance questionable transactions did not benefit the Company.

248. Hunsicker also enriched herself to the detriment of CaaStle, by, among other things, repaying personal loans using corporate funds.

249. The fact that CaaStle's share price increased during the Relevant Period does not evidence an inherent benefit to the Company from Hunsicker's fraud but rather served only to exacerbate the Company's losses and conceal the true financial condition of the Company.

250. Specifically, CaaStle's share price increased nearly twenty-fold between the 2011 and 2024 fiscal years, jumping from $0.32 to $6.20. However, the inflated share price resulted directly from Hunsicker's fraud and was disconnected from reality. As such Hunsicker's fraud only deepened the Company's losses and left creditors holding the bag when the music eventually stopped.

251. That Hunsicker's conduct, facilitated by the breaches and unlawful conduct of the other Defendants, harmed rather than benefitted CaaStle, is apparent by reviewing CaaStle's financial statements.

252. Indeed, during the Relevant Period, CaaStle's true financial metrics—most importantly, its cash position—decreased sharply from the time when Hunsicker's fraud began until the time when CaaStle filed for bankruptcy.

37

## COUNT I: BREACH OF FIDUCIARY DUTY – DUTY OF LOYALTY

*Plaintiff v. Christine Hunsicker*

253.    Plaintiff incorporates and realleges each and every allegation contained above, as though fully set forth herein.

254.    As a director and officer, Hunsicker owed fiduciary duties to CaaStle and its shareholders.

255.    Hunsicker breached her fiduciary duty of loyalty by knowingly, deliberately, continuously, and systematically falsifying financial statements and audit documents over a multi-year period beginning in 2019, and sharing such fraudulent information with shareholders, prospective investors, and the Board of Directors.

256.    On or about March 4, 2026, Hunsicker pled guilty to one count of securities fraud. She is subject to forfeiture of nearly $300 million in proceeds from her illegal scheme.

257.    Hunsicker's conduct obscured the legitimate operational and financial challenges facing CaaStle and prevented the Company from taking steps to restructure the Company and its operations.

258.    Hunsicker also breached her fiduciary duty of loyalty by misappropriating corporate assets and engaging in self-dealing, including but not limited to, using CaaStle funds to repay personal loans.

259.    Hunsicker's conduct constitutes conscious, intentional, and willful misconduct in violation of her fiduciary duty of loyalty to CaaStle.

260.    Hunsicker's conduct harmed CaaStle by, among other things, misappropriating CaaStle's funds and services, causing CaaStle to fraudulently induce investors to contribute hundreds of millions of dollars of capital, causing CaaStle's insolvency and bankruptcy, and

38

preventing the Company from continuing as a going concern by impeding CaaStle from seizing opportunities to resolve the legitimate operating and financial challenges predating her fraud.

## COUNT II: BREACH OF FIDUCIARY DUTY OF LOYALTY (OVERSIGHT)
*Plaintiff v. John Hennessy, Scott Callon, Jaswinder Pal Singh, and Georgiy Goldenberg*

261.    Plaintiff incorporates and realleges each and every allegation contained above, as though fully set forth herein.

262.    CaaStle is a Delaware corporation. Under Delaware law, the "business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors, except as may be otherwise provided in [the DGCL] or its certificate of incorporation." 8 Del. C. § 141(a).

263.    The Company's bylaws affirm the same, stating that CaaStle's powers "shall be exercised, its business conducted and its property controlled by or under the direction of the Board of Directors."

264.    Each Director on the CaaStle Board owed the Company a fiduciary duty of loyalty, including the duty to exercise adequate oversight over the affairs of the Company. CaaStle's officers, including Goldenberg, owed identical duties to the Company.

265.    The Directors and Goldenberg violated their duties of loyalty by consciously disregarding their responsibilities to implement reporting and control systems designed to provide the board with timely and accurate information addressing central objectives and compliance risks, namely, investor communications, fundraising, and financial reporting.

266.    The Directors and Goldenberg also breached their duty of oversight because to the extent any systems or controls were implemented, they consciously failed to monitor and oversee CaaStle's operations, thus rendering them unable to become informed of risks or problems requiring their attention.

#125534859v1

267.    CaaStle's capital was primarily derived through equity fundraising. As a result, investor outreach, fundraising, and financial controls were central and critical functions to CaaStle's operations. Moreover, there are numerous compliance risks, well known to Hennessy and Callon, associated with investor communications and fundraising.

268.    Yet, from the inception of the Company through the time that Hunsicker confessed her fraud, the Board utterly failed to institute adequate corporate structure, controls, and reporting systems to ensure the proper and legally compliant performance of these (and other) central activities.

269.    Moreover, the Board failed to develop and institute an adequate corporate structure for the Company. The Board's inaction allowed Hunsicker to isolate herself and hoard virtually exclusive control of key responsibilities, such as communicating with investors and the Board.

270.    Goldenberg failed to establish reporting procedures for CaaStle's finance employees.

271.    Goldenberg violated his duty of oversight as an officer by failing to apprise himself of the information being shared with the Board by Hunsicker. Goldenberg was—or consciously disregarded his duties in failing to be—privy to information, such as the revenue, valuation, and share price of CaaStle, that would have made it obvious to him that information shared with the Board and investors was fabricated.

272.    The Board's and Goldenberg's actions and inaction left Hunsicker unchecked in her exercise of investor activities and in communicating the Company's financial status. As a result of these failures, the Board and other Company executives lacked any visibility into Hunsicker's fraudulent activities for almost five years.

40

273.    Had the Board or Goldenberg taken even the slightest interest in exercising oversight or monitoring of CaaStle, Hunsicker would have been dissuaded from committing the fraud, or at the very least, her fraud would have been discovered earlier.

274.    Each individual Director and Goldenberg, in addition to their collective failures as described above, willfully and knowingly violated and breached their duties of loyalty to the Company.

275.    John Hennessy began serving on the Board on April 13, 2017, and received materials in advance of Board meetings as late as October of 2024. Hennessy knew or should have known that he was failing to discharge his fiduciary obligations of oversight over the Company, consciously disregarding his responsibilities as a Director.

276.    Despite Hennessy's vast experience serving on the boards of global powerhouses such as Alphabet, Inc. and Cisco Systems, he failed to suggest or cause to be implemented adequate governance structure and controls and failed to oversee or monitor the Company's affairs.

277.    Hennessy has been a member of the Board of Alphabet, Inc., for over twenty years, and has served as Chairman of the Board since 2018. According to the investor relations page on Alphabet's website, Alphabet has a Board structure with four permanent committees, including an Audit and Compliance Committee and a Nominating and Corporate Governance Committee (for which Hennessy serves as Chair).[2]

278.    Hennessy knew that the CaaStle Board's complete and utter lack of financial controls, failure to request or review any audited financial statements, nonexistent Board governance structure, infrequent and sporadic meetings, failure to maintain meeting minutes, and lack of insight into the Company's operations constituted a failure to adhere to his duties of

---

[2] https://abc.xyz/investor/board-and-governance/

oversight, and that the Board's oversight failures activities presented a material risk of allowing improper conduct.

279.    Furthermore, Hennessy's knowledge of his failure to discharge his fiduciary duty of loyalty is evidenced by his attempt to distance himself from CaaStle in relation to the period between 2021 and 2024.

280.    Scott Callon served as a member of the CaaStle Board from May 2014 to April 2025.

281.    Callon holds himself out as a "specialist" in the area of corporate governance. According to a 2018 article published in Forbes, the Japanese government in 2014 appointed Callon to serve on a committee tasked with drafting Japan's Corporate Governance Code, enacted in 2015. He also serves as a board member of the Japan Corporate Governance Network.[3]

282.    During his entire tenure as a Board member, Callon failed to actively engage in the management of the Company or oversee the affairs of the Company in any meaningful way.

283.    Callon apparently did not even possess a copy of the Company's articles of incorporation or bylaws until December 2024. That was also the first time he ever communicated with the Company's in-house counsel.

284.    After learning of Hunsicker's illegal conduct, Callon continued to consciously and willfully disregard his responsibilities, in violation of his duty of loyalty and oversight. Callon permitted Hunsicker, an admitted fraudster, to dictate the terms of her resignation and continue in her role as CEO of the Company until March 2025.

---

[3]    https://www.forbes.com/sites/japan/2018/03/01/scott-callon-how-an-american-corporate-governance-specialist-takes-a-zen-approach-to-investing-in-japan/

42

285. Furthermore, Callon agreed to a restructuring plan of CaaStle's business that would prioritize P180, a company for which Hunsicker still led the Board, effectively reinstating Hunsicker's control of CaaStle.

286. Callon knew or should have known that he was failing to discharge his fiduciary obligations of loyalty to the Company. Indeed, after learning of Hunsicker's fraudulent conduct, Callon conceded that Hunsicker had to be removed from the Board of directors and requested her resignation. Yet he still declined to immediately remove her as CEO.

287. Singh served on the Board from the Company's inception through 2017, and he rejoined the Board in December 2024.

288. During his first stint serving on CaaStle's Board, Singh failed to implement any systems or controls relating to the Company's fundraising efforts, financial reporting, and auditing processes.

289. On December 8, 2024, Hunsicker admitted to Callon and Singh that she had been providing falsified financial information to investors for years.

290. Like Callon, Singh knew that Hunsicker had to be removed from the Board due to her fraudulent activity, yet he permitted her to remain in her role as CEO until March 2025.

291. Singh agreed with Callon to the plan to reorganize CaaStle's affairs by prioritizing P180.

292. The aforementioned breaches of the Directors' fiduciary duties of loyalty constitute a conscious disregard of Singh's fiduciary responsibilities.

293. The aforementioned breaches of the Directors' fiduciary duties of loyalty are the legal and actual cause of damages to CaaStle, and the Company's ultimate demise.

43

294.     Had the Directors implemented adequate systems and controls, and overseen and monitored the Company's affairs, Hunsicker would not have been able to perpetrate her systemic, years-long fraudulent schemes.

295.     Furthermore, had the Directors discharged their fiduciary duties, they would have been able to assess the financial and operational shortcomings that spurred Hunsicker's fraud, and attempt to correct course to salvage the Company.

296.     The Directors' decision to allow Hunsicker to remain as CEO after she admitted to committing fraud resulted in additional losses to CaaStle until her resignation in March 2025.

## COUNT III: BREACH OF FIDUCIARY DUTY – DUTY OF LOYALTY
*Plaintiff v. Chirag Jain*

297.     Plaintiff incorporates and realleges each and every allegation contained above, as though fully set forth herein.

298.     Jain owed fiduciary duties to CaaStle as an officer of the Company, including but not limited to a duty of loyalty. The duty of loyalty includes the subsidiary requirement to act in good faith. A failure to act in good faith may be shown where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation.

299.     Officers are required to place the interests of the corporation and shareholders that they serve before their own, and act loyally by trying to do their job for proper corporate purposes in good faith, rather than disloyally by in bad faith putting other interests, such as the self-interest of a superior, ahead of the corporation's best interest.

300.     Jain's duty of good faith also requires candor to the Board. When a fiduciary withholds material information from the board, engages in deceptive conduct, or otherwise misleads the board, he has failed to act in good faith and therefore has acted disloyally.

301. In October 2023, Jain first learned that Hunsicker had provided false and misleading financial information to an investor.

302. Jain was involved in conversations with CaaStle's independent auditor, BDO, which subsequently led to BDO's termination of CaaStle as a client. BDO explicitly stated that it was terminating CaaStle due to the false and misleading information shared with the CaaStle investor in September 2023.

303. Jain did not report Hunsicker's provision of the false financials to any other executive, Director, shareholder, or potential investor. In fact, Jain actively concealed Hunsicker's wrongdoing.

304. Jain decided not to report the event to CaaStle's in-house counsel or outside counsel, Lori Hoberman, because of the stated concern that CaaStle's attorneys would be required to disclose the event to investors.

305. Furthermore, Jain instructed CaaStle's Financial Controller, Dayna Corlito, that, if anyone inquired about CaaStle's decision to retain a new auditing firm, she should say that the change was a cost-savings measure.

306. Jain worked alongside Corlito to complete a questionnaire from CaaStle's new auditing firm, Cerini, in which CaaStle failed to disclose Hunsicker's provision of false information, and they specifically represented instead that there "have [not] been any recent frauds."

307. Jain wrote to Corlito that he was seeking measures to ensure CaaStle had "recourse" to "maintain silence" from BDO regarding Hunsicker's conduct.

308. Thus, only BDO, Hunsicker, Jain, and Corlito knew of the incident that led to BDO's termination of its relationship with CaaStle.

#125534859v1

309.     Jain's concealment of suspicious activity from executives, officers, the Board, Cerini, shareholders, and investors, and his misrepresentations of Hunsicker's conduct, were not undertaken in furtherance of the best interests of CaaStle and its shareholders. Rather, Jain undertook this course of conduct for the express purpose of deceiving investors and protecting his boss, Christine Hunsicker, from potential ramifications.

310.     The aforementioned breaches of Jain's fiduciary duty of loyalty constitute bad faith, an intentional dereliction of duty, and a conscious disregard for his responsibilities.

311.     As a result of Jain's successful efforts to keep Hunsicker's fraud silent, Hunsicker was able to continue defrauding investors, culminating in additional damages to investors harmed by Hunsicker's fraud, and CaaStle's eventual demise.

### COUNT IV: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
*Plaintiff v. Dayna Corlito, Lori Hoberman, and Hoberman Law Group PLLC*

312.     Plaintiff incorporates and realleges each and every allegation contained above, as though fully set forth herein.

313.     Defendant Dayna Corlito aided and abetted Hunsicker's breaches of fiduciary duty by knowingly participating and assisting in Hunsicker's breaches of her fiduciary duties to CaaStle.

314.     Because CaaStle lacked an audit committee, Corlito was appointed as the primary point of contact between CaaStle and its outside auditing firm, BDO.

315.     As a result, Corlito was the first CaaStle representative informed by BDO about Hunsicker's sharing of falsified financial information to an investor in October 2023.

316.     BDO directly informed Corlito that it would be terminating its relationship with CaaStle, and it specifically stated that its reason for the termination was that BDO had no appetite for working with a company that shares falsified financial information to investors.

46

#125534859v1

317.    Rather than report Hunsicker's misconduct, Corlito worked with Jain to actively suppress the real reason for BDO's termination of its relationship with CaaStle.

318.    Corlito falsely told third parties, including CaaStle's new auditor, Cerini, that CaaStle was changing auditors only as a cost savings measure, and affirmatively represented to Cerini that no fraud had recently occurred at CaaStle.

319.    Corlito's concealment and misrepresentations allowed Hunsicker to evade detection and legal liability and provided Hunsicker the opportunity to continue her course of fraudulent conduct.

320.    Corlito knew that Hunsicker's conduct constituted a breach of Hunsicker's fiduciary duties and knew that her concealment and misrepresentations about the incident involving BDO were legally improper, evidenced by Corlito's conversations with Jain regarding keeping BDO silent about Hunsicker's falsification of financial documentation in September and October of 2023.

321.    Corlito is jointly and severally liable for the damages caused to CaaStle by Hunsicker's breaches of fiduciary duty.

322.    Defendant Lori Hoberman aided and abetted Hunsicker's breaches of fiduciary duty by knowingly participating and assisting in Hunsicker's breaches of her fiduciary duties to CaaStle.

323.    Hoberman's primary responsibility as outside counsel for CaaStle was to assist Hunsicker's communications with investors.

324.    Hoberman made materially false statements to prospective investors, and upon information and belief, Hoberman was instructed to do so by Hunsicker.

47

325. On at least one occasion, Hoberman falsely represented to a prospective investor that CaaStle does not maintain audited financial reports, despite her previous participation in the audit process with BDO. Hoberman's misrepresentation prevented the prospective investor from ascertaining CaaStle's true financial metrics.

326. Moreover, beginning no later than October 2023, Hoberman had knowledge that Hunsicker had provided fabricated financial information to investors. Hoberman was directly involved in negotiations to settle and release all claims related to Hunsicker's provision of false information to Investor A.

327. Notwithstanding Hoberman's knowledge of Hunsicker sharing inflated financial metrics to investors, Hoberman continued to assume an investor-facing role and solicit investments in CaaStle.

328. Hoberman knew that Hunsicker's conduct of hiding audited financial reports from investors, sharing falsified financial information, and solicitation of investment under false pretenses constituted a breach of Hunsicker's fiduciary duties. Hoberman also knew that assisting Hunsicker's continued solicitation of investments, and making false statements to investors was unlawful.

329. Hoberman is jointly and severally liable for the damages caused to CaaStle by Hunsicker's breaches of fiduciary duty.

330. Defendant Hoberman Law Group PLLC is vicariously liable for the above-described acts and omissions by Hoberman, the law firm's sole practitioner.

331. Hoberman's unlawful conduct was within the scope of her employment.

332. Hoberman Law Group PLLC is jointly and severally liable for the damages caused to CaaStle by Hunsicker's breaches of fiduciary duty.

48

## COUNT V: DIRECTOR LIABILITY FOR UNLAWFUL REDEMPTIONS PURSUANT TO 8 DE CODE §§ 160 & 174

*Plaintiff v. Hennessy, Callon. Hunsicker and Singh*

333. Plaintiff incorporates and realleges each and every allegation contained above, as though fully set forth herein.

334. Hennessy, Callon, Hunsicker and Singh are jointly and severally liable for unlawful redemptions that occurred under their administration as Directors of CaaStle.

335. This Count only seeks to impose joint and several liability on the Directors in relation to redemptions in favor of third parties that occurred under their administration as Directors.

336. Directors Hunsicker and Singh each received improper redemption of stock.

337. Plaintiff has filed a separate complaint against Singh to avoid and recover such improper transfer made to Singh of $6 million and intends to file a separate complaint against Hunsicker to avoid and recover transfers made to Hunsicker.

338. Accordingly, Plaintiff does not assert a claim in this action to recover from Singh the transfer made to or for the benefit of Singh; or to recover from Hunsicker the transfers made to or for the benefit of Hunsicker. Rather, Plaintiff seeks in this action to recover from each director the amount of transfers to third parties as improper stock redemptions during their time as directors.

339. Pursuant to 8 DE. Code § 160 and Delaware common law, a corporation shall not purchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of capital of the corporation.

49

340.    Corporations are also prohibited from repurchasing shares when the purchases diminish the ability to continue as a going concern or render the company insolvent. To continue as a going concern, a corporation needs sufficient resources to operate for the foreseeable future without the threat of liquidation.

341.    Pursuant to D.E. Code § 174, where a company willfully or negligently violates §160 by permitting unlawful stock purchases or redemptions, directors under whose administration those purchases or redemptions occur are jointly and severally liable to the corporation and its creditors in the event of its dissolution or insolvency, for the full amount unlawfully paid for the purchase or redemption of the corporation's stock, with interest.

342.    CaaStle unlawfully redeemed a total of approximately $38 million in stock in the period from 2021 to 2024.

343.    The Redemptions occurred when CaaStle's capital was impaired because at all relevant times CaaStle was insolvent, and the Redemptions hindered CaaStle's ability to continue as a going concern because the Board failed to retain resources sufficient to operate for the foreseeable future without the threat of liquidation.

344.    In fact, CaaStle filed under Chapter 7 of the bankruptcy code about a year later in June 2025.

345.    At all times relevant to this claim, CaaStle's balance sheet significantly overstated the fair value of its assets and understated its liabilities.

346.    For example, "intangible assets, net of accumulated amortization," ostensibly the most valuable assets on CaaStle's balance sheet, were significantly less valuable than stated on the balance sheet.

50

347.    Moreover, at the time the Redemptions were made, investors in CaaStle held claims against the company based on Hunsicker's misrepresentations of financial performance. Such investor claims were not reflected as liabilities on CaaStle's balance sheet.

348.    Yet even without taking such investor claims into account, CaaStle was insolvent when the Redemptions were made.

349.    According to the Indictment, financial reports falsified by Hunsicker indicated (a) that the company's operating profit in the second quarter of 2023 was nearly $24 million, while the actual operating profit was less than $30,000; (b) that the company's revenue for 2021 was more than $100 million higher than the actual result; and (c) that the company's net revenue for 2022 was $230 million while the actual net revenue did not exceed $20 million.  See Indictment at ¶¶ 6-7.

350.    Moreover, CaaStle's inability to continue as a going concern in the face of the Redemptions is made clear by the audited financial statements prepared by Cerini for the years 2022 and 2023.

351.    CaaStle was unprofitable and had deep operating losses during the time period in which the Redemptions occurred (*e.g.*, $81 million in 2023 and $55.7 million in 2022). CaaStle's operating losses from the company's inception through 2023 totaled over $500 million.

352.    At the end of CaaStle's 2023 fiscal year (September 2023), CaaStle had less than $1 million cash on hand.

353.    At all times relevant hereto, in light of CaaStle's inadequate cash levels, inability to make a profit, and tremendous operating losses, it is clear that CaaStle intended to incur, or believed or should have believed that CaaStle would incur debts beyond its ability to pay as they came due.

51

354.    In addition, as Cerini noted, CaaStle planned to finance its operations through additional equity financing, yet CaaStle's true financial position made it increasingly unlikely that additional funding would be available to CaaStle. Indeed, Cerini concluded that if the Company was unable to obtain an adequate level of financing, there will be adverse effects on CaaStle's ability to execute its business plan, raising "substantial doubt about the ability of the Company to continue as a going concern."

355.    Furthermore, upon information and belief the Board failed to conduct any analysis whatsoever to determine whether the Redemptions were being done for a legitimate business purpose, would impair CaaStle's capital or render the Company insolvent, or whether the value of the shares being redeemed was reasonable or based in reality.

356.    Hennessy and Callon failed at all times to apprise themselves of CaaStle's financial condition. They were willfully blind and failed to implement basic systems, such as an audit committee, necessary to oversee and monitor the Company's financial reporting and fundraising activities. Moreover, the Board rarely met and did not keep meeting minutes.

357.    At all relevant times, Hunsicker knew of CaaStle's true financial position and was aware that CaaStle was insolvent or that the Redemptions would render CaaStle insolvent.

358.    Hennessy, Callon and Singh did not abstain from or dissent to the Redemptions, and/or failed to cause any dissent to be entered on the books containing the minutes of the proceedings of the directors at the time the Redemptions were made.

359.    The Redemptions occurred when CaaStle was insolvent and/or hindered CaaStle's ability to continue as a going concern and constituted a material factor in CaaStle's insolvency and filing for protection under Chapter 7.

360.    Hennessy, Callon, Hunsicker and Singh are each jointly and severally liable for the unlawful Redemptions, which occurred during their respective time periods that those individuals served as directors, because CaaStle willfully or negligently violated DE Code § 160 by permitting redemptions of its shares of capital stock when the capital of the corporation was impaired or when such purchase or redemption would cause an impairment of capital of the corporation.

**WHEREFORE**, Plaintiff respectfully requests the entry of judgment in his favor against each of the Defendants, jointly and severally, for compensatory damages, punitive damages, and for attorneys' fees and costs and such other relief that the Court deems may be proper and just.

Dated: March 27, 2026                                   **DILWORTH PAXSON LLP**

/s/ Peter C. Hughes
Peter C. Hughes (No. 4180)
800 N. King Street, Suite 202
Wilmington, DE 19801
Telephone:      302-571-9800
Facsimile:      302-571-8875
Email:          phughes@dilworthlaw.com


                and


s/ Ira N. Richards
Lawrence G. McMichael
Ira N. Richards
David Rodkey
One Liberty Place
1650 Market St., Suite 1200
Philadelphia, PA 19103
Telephone:      (215) 575-7000
Facsimile:      (215) 754-4603
Email:          irichards@dilworthlaw.com
                lmcmichael@dilworthlaw.com
                drodkey@dilworthlaw.com

*Attorneys for George L. Miller, Chapter 7 Trustee*

#125534859v1